<table>
<tr><td>

**Sealed**
Public and unofficial staff access
to this instrument are
prohibited by court order

</td><td>

## UNITED STATES DISTRICT COURT

for the

Southern District of Texas

</td><td>

United States Courts
Southern District of Texas
FILED

*March 04, 2025*

Nathan Ochsner, Clerk of Court

</td></tr>
</table>

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
)
AN AT&T PHONE WITH PHONE NUMBER )
409-270-5080 AND IMSI 310280079454066 )
(TARGET PREMISES #3) )

Case No. **4:25-mc-5531**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
AN AT&T PHONE WITH PHONE NUMBER 409-270-5080 AND IMSI 310280079454066

located in the _____Southern_____ District of _____Texas_____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachments A-3 and B-3 to the Affidavit in Support of an Application for Search Warrant.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 | Distribution of Controlled Substances |
| 21 U.S.C. § 846 | Conspiracy to Distribute Controlled Substances |
| 21 U.S.C. § 856(a)(2) | Maintaining a Drug-Involved Premises |
| 18 U.S.C. §§ 1956 and 1957 | Money Laundering and Money Laundering Conspiracy |

The application is based on these facts:
See attached Affidavit of Task Force Officer Michael Henson, Drug Enforcement Administration

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Michael Henson Task Force Officer, DEA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____Telephone_____ *(specify reliable electronic means)*.

Date: March 04, 2025

*Judge's signature*

City and state: Houston, Texas

United States Magistrate Judge Yvonne Ho
*Printed name and title*

**Sealed**

Public and unofficial staff access
to this instrument are
prohibited by court order

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH OF | ) | |
| | ) | |
| SERVMED RX PHARMACY AT | ) | **4:25-mc-5529 to 5532** |
| 307 S. FRIENDSWOOD DR., | ) | |
| FRIENDSWOOD, TEXAS 77546 | ) | |
| (**TARGET PREMISES #1**); | ) | |
| | ) | Case No. _____ |
| A T-MOBILE PHONE WITH PHONE | ) | |
| NUMBER 346-579-1272 AND IMSI | ) | |
| 310260404178803 (**TARGET PREMISES #2**);) | |
| | ) | |
| AN AT&T PHONE WITH PHONE NUMBER | ) | |
| 409-270-5080 AND IMSI 310280079454066 | ) | |
| (**TARGET PREMISES #3**); and | ) | |
| | ) | |
| A GRAY 2015 BMW 528, PLATE # PYN6831 | ) | |
| VIN# WBA5A7C58FG142807 | ) | |
| (**TARGET PREMISES #4**) | ) | |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION
## UNDER RULE 41 FOR WARRANTS TO SEARCH AND SEIZE

I, Michael E. Henson, being first duly sworn, hereby depose and state as follows:

### EXECUTIVE SUMMARY

1. SHALANNA JENKINS is engaged in a scheme, with others known and unknown to the investigation (collectively, with JENKINS, the "DTO"), to illegally purchase and sell onto the black-market opioids and other commonly abused prescription drugs.

2. JENKINS is known to be operating ServMed Rx Pharmacy ("SERVMED"), located at 307 S. Friendswood Dr., Ste. D1, Friendswood, Texas, 77546 (**TARGET PREMISES #1**). The investigation has generated probable cause to believe that the DTO is operating SERVMED as a "ghosting" pharmacy, a term used by law enforcement to describe a

pharmacy that traffics in opioids and other controlled drugs with high street value, by sourcing the pills from complicit wholesalers and selling them in bulk, directly onto the black market, without the involvement of any prescriptions, patients, or doctors.

3.      Recently, JENKINS—who is not a pharmacist, is not licensed as a pharmacy technician, and is not known to have any other pharmaceutical credentialing—has been observed at SERVMED receiving boxes from pharmaceutical distributors that I know from this and other investigations supply Houston-area pill-mill pharmacies with commonly abused prescription drugs that are diverted onto Houston's black market.

4.      Investigators conducting surveillance have repeatedly observed JENKINS talking on a cellular phone (red arrows added):



5.      As set forth further below, I believe JENKINS uses at least two devices, and three phone numbers, to perpetrate the DTO's scheme to divert commonly abused prescription drugs the DTO acquires through SERVMED, including a T-Mobile phone with phone number 346-579-1272 and IMSI 310260404178803 (the "JENKINS PHONE," which is **TARGET**

**PREMISES #2**); an AT&T phone with phone number 409-270-5080 and IMSI 310280079454066 (the "SERVMED PHONE," which is **TARGET PREMISES #3**); and a Voice-over-IP line with the phone number 346-313-8575 (the "VoIP LINE"),[1] which I believe JENKINS accesses through an application or applications on the JENKINS PHONE, the SERVMED PHONE, and/or on another device or devices that I believe will be on or near JENKINS' person at the time the warrants I seek are executed.

6. I also know from my investigation that in the last two years, SERVMED has purchased more than 100,000 opioid pills, and at least 261,691 dosage units of other commonly abused controlled pharmaceutical drugs with substantial resale value on the black market; but the pharmacy has not reported dispensing any of them pursuant to a prescription to the Texas Prescription Monitoring Program, as is required by state law. In fact, on the numerous occasions when investigators have conducted surveillance at SERVMED, they have never seen any individual believed to be a patient enter or exit SERVMED; nor have they observed SERVMED's registered owner, Monique WASHINGTON, or any pharmacist, at the pharmacy. Only JENKINS has been observed there.

7. As described further below, there is probable cause to believe that JENKINS' activity at SERVMED consists mainly, if not entirely, of receiving shipments from distributors, unboxing the contents that include controlled drugs, placing the drugs into bags, and loading the bags into the trunk of a gray 2015 BMW 528, Plate # PYN6831, registered to JENKINS at 1806 Fallow Ln., Houston, Texas 77049 (the "VEHICLE," which is **TARGET PREMISES #3**).

---

[1] I understand from training and experience that a VoIP number is essentially a telephone number that operates on the internet rather than through a traditional phone line. I further understand that a VoIP number can be assigned to any mobile phone, including one with a "regular" number that can also answer calls made to/from the VoIP number.

8.     Accordingly, I submit this affidavit for warrants to search **TARGET PREMISES #1, #2, #3, and #4**, defined here and in Attachments A-1 through A-4. As explained below, I submit that there is probable cause to believe that these searches will yield evidence, fruits, instrumentalities, and contraband, described here and in Attachments B-1 through B-4, of the DTO's ghosting and other illicit activities.

## IDENTITY AND EXPERIENCE OF AFFIANT

9.     I am a Task Force Officer ("TFO") assigned to the Drug Enforcement Administration ("DEA"), Galveston Resident Office ("GRO"). The GRO is a multi-agency task force that investigates the illegal trafficking of illicit drugs and pharmaceutical controlled substances. The GRO task force is comprised of agents from the DEA, Internal Revenue Service, Homeland Security Investigations, and state/local law enforcement personnel assigned as TFOs.

10.     I am a licensed Peace Officer in the State of Texas employed by the Dickinson Police Department as a Detective in the Criminal Investigations Division who deals with the Texas Penal Code and the Texas Health and Safety Code. I have been a licensed police officer for over 25 years and currently hold a "Master Police Officer License." I have been a narcotics investigator for over 16 years and held similar positions with the Galveston County Narcotic Task Force, as well as the United States Customs and the Texas Department of Public Safety Narcotic Services prior to my assignment with DEA. I have attended specialized training with DEA and through the Texas Narcotic Officers Association concerning violations of the Controlled Substances Act within Title 21 of the United States Code.

11.     As a TFO with the DEA, I have been a case agent or a participant in numerous narcotics trafficking investigations, many of which have involved the diversion (illegal sale outside the closed system of distribution mandated by law) of Schedule II-V pharmaceutical

drugs. I am familiar with smuggling techniques, counter-surveillance techniques and other methods used by narcotics traffickers. I have received many hours of formal training in the detection and apprehension of persons involved in the illegal trafficking of narcotics. I have received comprehensive, formalized instruction in such matters as narcotics identification, detection, trafficking, and interdiction; money laundering techniques; and asset identification, seizure, and forfeiture, and have received training in the conduct of narcotics enforcement and investigations. I have training and experience in narcotics investigations to include surveillance and working with informants and have participated in and conducted investigations that have resulted in the arrest and conviction of individuals who have smuggled, received, and distributed controlled substances, as well as the seizure of illegal drugs and proceeds derived from the sale of those drugs.

12.     Through my assignment with GRO since September 2010, I have spoken with pharmacists, physicians, diversion investigators, state medical board investigators, pharmacy board investigators, patients, and others with extensive knowledge of pharmaceuticals, regarding the methods and practices of individuals trafficking in or diverting pharmaceutical controlled substances. I have directed, supervised, and participated in many searches of the residences and businesses of suspected drug traffickers for evidence of criminal activity. I have also conducted and participated in the debriefing of many drug traffickers and money launderers, through which I have learned valuable information regarding the techniques used by drug trafficking organizations to distribute drugs in both domestic and international markets. In addition, in connection with these and other cases, I have conducted follow-up investigations I am familiar with the ways in which drug traffickers conduct their business, including, but not limited to, their methods of importing and distributing controlled substances and their use of mobile telephones.

13.     Based on my experience, persons that are engaged in the business of drug trafficking and laundering of large quantities of U.S. currency illicitly derived from the importation and distribution of drugs, typically keep in the premises over which they maintain control (such as residences, rental property, workplaces, storage units, bank safety deposit boxes, and safes) the following: United States currency, money orders, correspondence, faxes, ledgers, personal telephone and address books, messages (both handwritten and electronically stored such as in cellular telephones, and computers), bank records, wire transfer records, records of business and/or real estate transactions, money order receipts, cashier's checks, money counting machines, money wrappers, rubber bands, containers used to carry and/or store large amounts of currency, and digital devices, such as computers, smart phones, and storage media, that contain evidence of drug trafficking and other crimes.

14.     I have participated in numerous investigations like the one described in this affidavit and in nearly all of those investigations, many or all of these items have been found in the premises controlled by the targets of those investigations.

### PURPOSE OF THE AFFIDAVIT

15.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search of the following:

a. SERVMED, which is a pharmacy located at 307 S. Friendswood Dr., Ste. D1, Friendswood, TX 77546 ("**TARGET PREMISES #1**"). **TARGET PREMISES #1** is more fully described in Attachment A-1;

b. a cellular phone with T-Mobile phone number 346-579-1272, subscribed to Sheila Shepard, 1806 Fallow Ln., Houston, Texas 77049, with IMSI 310260404178803 (the "JENKINS PHONE," which is **TARGET PREMISES #2**). **TARGET PREMISES #2** is more fully described in Attachment A-2;

c. a cellular phone with AT&T phone number 409-270-5080 and IMSI 310280079454066, subscribed to PREPAID CUSTOMER at 307 S Friendswood Dr., Friendswood, Texas 77546 (the "SERVMED PHONE," which is **TARGET**

**PREMISES #3**). **TARGET PREMISES #3** is more fully described in Attachment A-3; and

d. A 2015 gray BMW 528, VIN# WBA5A7C58FG142807; Plate # PYN6831, registered to JENKINS at 1806 Fallow Ln., Houston, Texas, 77049 (the "VEHICLE," which is **TARGET PREMISES #4**). **TARGET PREMISES #4** is more fully described in Attachment A-4.

(collectively, **TARGET PREMISES #1, #2, #3,** and **#4** are the "**TARGET PREMISES**").

16.     Based on my training, experience, and the facts set forth in this affidavit, I have probable cause to believe that JENKINS and the DTO are involved in committing violations of the Controlled Substances Act, including: 21 U.S.C. § 841 (Distribution of Controlled Substances); 21 U.S.C. § 846 (Conspiracy to Distribute Controlled Substances), 21 U.S.C. § 856(a)(2) (Maintaining a Drug-Involved Premises); and 18 U.S.C. §§ 1956 and 1957 (Money Laundering and Money Laundering Conspiracy) (collectively, the "Target Offenses").

17.     I also have probable cause to believe that the **TARGET PREMISES** contain evidence, fruits, instrumentalities, and contraband of these crimes, more particularly described in Attachments B-1 through B-4.

18.     The information in this affidavit is derived from my participation in this investigation and information obtained from several sources, including oral and written reports about this and other investigations that I received from various federal and local law enforcement agencies; physical surveillance in which I participated directly or that was directly or indirectly reported to me; and analysis, conducted by myself and others in law enforcement, of telephone toll records, bank records, business records, and public sources.

19.     Through my personal participation in this investigation, I have become familiar with all aspects of this investigation. However, because this affidavit is submitted for the limited purpose of securing authorization for search warrants, I have not included every fact known to

me concerning the investigation. I have set forth only the facts that I believe are essential to establish probable cause for the requested search warrants.

## BACKGROUND

15.     According to 21 C.F.R. § 1306.14, every person who dispenses a controlled substance must be registered to do so with the DEA. 21 C.F.R. § 1306.04(a) further provides:

> A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner but a corresponding responsibility rests with the pharmacist who fills the prescription.

16.     The Prescription Monitoring Program ("PMP") is a database to which Texas pharmacies are legally required to report all prescriptions for controlled substances that are dispensed in Texas.

17.     DEA registrants who manufacture and/or distribute controlled substances are required to report all Schedule II and Schedule III narcotic transactions to DEA's Automated Records and Consolidated Ordering System ("ARCOS") unit, which is then maintained by DEA in what is known as the ARCOS database.

18.     21 U.S.C. § 812 establishes five schedules of controlled substances—Schedules I, II, III, IV, and V—based on the drug's potential for abuse, its currently accepted medical use, and the severity of physical or psychological dependence that could result from its abuse. Pharmaceutical drugs listed in Schedules II through V have an accepted medical use but have a substantial potential for abuse and addiction. Relevant here,

a.      **Oxycodone** (street name "roxy" or "the blues") is the generic name for a Schedule II analgesic drug that is typically prescribed for moderate-to-severe pain relief. Due to its potential for addiction, oxycodone prescriptions are generally issued for a modest number of pills to be taken over a short period of time. Oxycodone's most sought-after

form on Houston's black market is a blue 30 mg pill, which sells in that form for $1 per milligram or more.

      b.    **Hydrocodone** (street name "norcos") is the generic name for a Schedule II analgesic drug that is prescribed for pain. Hydrocodone's most sought-after form on Houston's black market is a "combination" pill containing 10 mg of hydrocodone and 325 mg of acetaminophen ("10-325 mg" pills). In that form, hydrocodone sells for $1 per milligram or more.

      c.    "**Potentiators**," so-called because they enhance the high from opioids like oxycodone and hydrocodone, include **carisoprodol** (street names "Somas" or "circles"), a Schedule IV controlled substance classified as a muscle relaxant; **alprazolam** (street names "bars" or "handlebars"), a Schedule IV anti-anxiety medication; and **promethazine with codeine** (street names "lean" and "syrup"), a cough syrup.

(Collectively, oxycodone 30 mg, hydrocodone 10-325 mg, and the potentiators are the "Commonly Abused Prescription Drugs.")

19.    Based upon my training and experience, I know that the greater Houston area ("the Houston area")—which includes the Texas counties of Austin, Brazoria, Chambers, Fort Bend, Galveston, Harris, Liberty, Montgomery, and Waller—is a nationally recognized "hot zone" for clinics and pharmacies involved in diverting the Commonly Abused Prescription Drugs onto the black market (with each such clinic and pharmacy operating as a "pill mill").

20.    Pill mill pharmacies in the Houston area typically buy Commonly Abused Prescription Drugs from complicit wholesalers that I know from training and experience usually:

    a.  charge over-market rates for both controlled and non-controlled drugs;

    b.  perform little or no due diligence on pharmacy customers;

    c.  limit how many Commonly Abused Prescription Drug pills/doses any pharmacy may purchase per week or month; and

    d.  require pharmacies to buy four non-controlled pills for every Commonly Abused Prescription Drug pill/dose; and

    e.  use private mail carriers, including FedEx and UPS, to ship Commonly Abused Prescription Drugs to pharmacies throughout the Houston area.

21.     To attempt to evade detection by law enforcement, pill mill pharmacies in the Houston area deploy different schemes. The one SERVMED uses, with which I have become familiar through my own investigations, is what I and other law enforcement officers call "pharmacy ghosting." In a ghosting scheme, the pharmacy maintains a physical space mainly for the purpose of accepting shipments of controlled drugs from complicit wholesalers. The wholesalers usually report to DEA's ARCOS database each sale of Schedule II and Schedule III narcotic drugs, as the wholesalers are required to do by law; however, the pharmacies rarely report dispensing any of the drugs to patients via to the state's PMP database, which the pharmacies are required by law to do, because ghosting schemes involve no prescriptions, patients, or doctors. Instead, ghosting pharmacies sell the drugs "out the back door," in bulk.

22.     Ghosting pharmacy drug trafficking organizations often include licensed pharmacists to secure the necessary credentialing from the Texas State Board of Pharmacy (the "Board" or "TSBP"). However, the pharmacists listed with the Board often serve only as "straws," having little to no involvement in the day-to-day operations of the pharmacies.

## PROBABLE CAUSE TO BELIEVE JENKINS AND THE DTO HAVE COMMITTED AND ARE COMMITTING THE TARGET OFFENSES

### A.  SERVMED's ownership and personnel

23.     TSBP records reflect that SERVMED received License Number 34104 on January 11, 2022, to operate at 307 S Friendswood Drive, Ste D-1, Friendswood, Texas, 77546 (**TARGET PREMISES #1**). The pharmacist-in-charge ("PIC") was listed as Quynhanh Mui, License Number 55998. On February 27, 2025, a query of TSBP's website confirmed that SERVMED maintains an active license to operate at **TARGET PREMISES #1**, and that the current PIC there is Ronald Kevin Patrick, License Number 32060. TSBP lists SERVMED's

owner as ServMed Rx LLC, with Monique WASHINGTON as corporate officer. There has never been any pharmacy technician listed.

24.    Records maintained by the Texas Secretary of State ("TXSOS") also list SERVMED's owner as ServMed Rx LLC, with WASHINGTON as corporate officer (Managing Member and Director) since on or about June 2, 2023. I am familiar with WASHINGTON from a prior investigation into suspected Houston area ghosting pharmacy Buffalo Rx.[2]

25.    I am not aware of JENKINS being listed on any SERVMED paperwork. However, I am familiar with JENKINS from a prior Houston area pill-mill clinic investigation, in which I was not directly involved, but about which I am familiar through reports I have reviewed. As part of that investigation, in August 2015, DEA assisted the Texas Medical Board ("TMB") with serving an administrative subpoena at Alpha Omega Chiropractic & Wellness Utopia, suspected at the time of being a pill-mill clinic that distributed controlled substances without a legitimate medical purpose. Investigators observed Schedule II controlled substance prescriptions purportedly signed by Dr. Katherine Blanchette, which clinic employees said were written to individuals brought by JENKINS to pose as patients to receive those prescriptions without any legitimate medical need for them. Investigators determined that Blanchette had not seen the patients, though JENKINS would not admit that she (JENKINS) knew this. Ultimately, TMB suspended the medical license of Dr. Blanchette in October 2015, after determining her continuation in the practice of medicine posed a continuing threat to the public welfare.

---

[2] On or about September 21, 2022, investigators conducting surveillance at Buffalo Rx observed a vehicle leased by WASHINGTON. Analysis of the pharmacy's bank records reflected WASHINGTON paying and being paid by the pharmacy's Bank of America account ending in *9190. Buffalo Rx ceased operating not long after I began to investigate it, and charges were never brought in that investigation.

26.     To date, JENKINS is the only person investigators conducting surveillance have ever seen enter or leave SERVMED.

**B.**  **SERVMED's purchasing and dispensing data show Commonly Abused Prescription Drugs coming into, but not going out of, SERVMED.**

15.     DEA Diversion Investigators have analyzed SERVMED's ARCOS data from in or around February 2022 through the end of January 2024. That analysis revealed that before early August 2023 (about a year and a half after SERVMED obtained its TSBP license), SERVMED purchased no ARCOS-reportable drugs (i.e., no Schedule II and Schedule III narcotic drugs, which include the Commonly Abused Prescription Drugs hydrocodone 10-325 mg and oxycodone 30 mg).

16.     From on or about August 3, 2023, through on or about April 3, 2024, the ARCOS data reflects that SERVMED purchased 57,100 oxycodone 30 mg pills and 44,500 hydrocodone 10-325 mg pills, and no other ARCOS-reportable drugs of any other strength or kind, which I know from training and experience is consistent with a pharmacy operating as a pill mill.

17.     PMP data obtained and analyzed for SERVMED for the same timeframe revealed that SERVMED has never reported dispensing a single controlled substance pill—ARCOS-reportable or otherwise—which I know from training and experience is consistent with pharmacy ghosting (i.e., with distributing the drugs out the "back door" in bulk, as opposed to pursuant to prescriptions that would then be reported to PMP).

18.     Around April 3, 2024, according to the ARCOS data, SERVMED abruptly ceased purchasing ARCOS-reportable drugs from any wholesaler.[3] I know from training and experience that wholesalers sometimes cut off pharmacy customers from purchasing ARCOS-reportable

_____

[3] The single exception is a November 18, 2024 transaction reported by wholesaler Yavari, reflecting that SERVMED purchased 300 pills of acetaminophen with codeine 300/30 mg.

drugs based on information the wholesalers receive from common sources of supply—usually larger distributors or manufacturers. When that happens, I know from my other investigations, that the wholesalers sometimes continue to sell Potentiators (which are not reportable to ARCOS) to the Houston area pill-mill pharmacies. I am also aware of wholesalers that only sell Houston area pill mills Potentiators, in what I believe is an effort to stay off regulator and law enforcement (including DEA) radar by selling only Commonly Abused Prescription Drugs that are not ARCOS-reportable.

19.     I have obtained records from several wholesalers that I know from this and other of my investigations sell Potentiators to Houston area pill mills, which revealed the following sales of Potentiators to SERVMED:

| Wholesaler | Timeframe | Drug | Dus (pills/doses) |
|---|---|---|---|
| Bloodworth | 04/2024 - 08/2024 | Carisoprodol 350mg | 48,500 |
| | | Alprazolam 2mg | 23,500 |
| | | Promethazine/Codeine* | 4,257 |
| Safe Chain | 05/2024 - 02/2025 | Alprazolam 2mg | 11,000 |
| | | Promethazine/Codeine* | 7,852 |
| Wesley | 04/2024 - 09/2024 | Carisoprodol 350mg | 22,000 |
| | | Alprazolam 2mg | 13,000 |
| | | Promethazine/Codeine* | 3,406 |
| | | Grand Total | 133,815 |
| | *assumes 5 ml dose | | |

20.     I submit, based on records obtained from several wholesalers that have been shipping Potentiators to SERVMED since April 2024, and on instances of surveillance including those set forth in the next section of this affidavit, that probable cause exists to believe that SERVMED continues to "ghost" potentiators to this day.

**C. Surveillance conducted at SERVMED, from June 2024 through the present, shows that SERVMED is "ghosting" shipments of Potentiators**

21.     On **June 21, 2024**, I received information from a credible source (the "SOI")[4] that SERVMED was scheduled to receive a shipment from Safe Chain, a wholesaler of pharmaceutical drugs that I know from my pill-mill pharmacy investigations regularly supplies Commonly Abused Prescription Drugs to suspected pill-mill pharmacies in the Houston area.

22.     Officers conducting surveillance at SERVMED/**TARGET PREMISES #1** spotted the VEHICLE/**TARGET PREMISES #4**—a gray 2015 BMW 528 displaying Texas License Plate # PYN-6831—backed into a parking space in front of the pharmacy. I observed an individual wearing pink scrubs, who I later identified as JENKINS, walking out of SERVMED carrying a colorful bag, which she (JENKINS) placed into the trunk of the VEHICLE. JENKINS then placed what appeared to be some broken-down cardboard boxes and a gray trash bag into the back seat of the VEHICLE, locked the front door of SERVMED, pulled the VEHICLE around the corner to a dumpster located on the property, and disposed of the boxes and trash bag before returning to the VEHICLE and driving away.

23.     Agents collected the discarded items from the dumpster, among them, a "Sorry We Missed You" notice from UPS bearing notice number 928143709219. A check of the UPS tracking system for the notice number showed a delivery date of June 20, 2024, that included three associated UPS package tracking numbers: 1Z1739800146548969, 1Z3865880177660948, and 1Z7156792494904705. Agents received records from Wesley Pharmacal ("Wesley"), Bloodworth Wholesale Drugs ("Bloodworth"), and Safe Chain Solutions ("Safe Chain")—all wholesalers that I know sell or sold Commonly Abused Prescription Drugs to pill-mill

---

[4] The SOI is an employee of a major mail carrier whose information I have corroborated on previous occasions and found to be reliable.

pharmacies in the Houston area[5]—which confirmed SERVMED received the following controlled substances that day:

| UPS Tracking | Wholesaler | Drug | DUs |
|---|---|---|---|
| 1Z1739800146548969 | Wesley | Alprazolam 2mg<br>Carisoprodol 350mg<br>Prometh/Codeine | 2,000<br>2,000<br>284 |
| 1Z3865880177660948 | Bloodworth | Alprazolam 2mg<br>Carisoprodol 350mg | 1,500<br>3,000 |
| 1Z7156792494904705 | Safe Chain | Prometh/Codeine | 284 |

24.     Other agents followed the VEHICLE to 12819 Gable Wind Mill Lane, Houston, Texas, 77044, which appeared to be a residence. JENKINS was observed carrying the colorful bag from the trunk of the VEHICLE into the residence. Agents identified two additional vehicles there: a BMW with Plate # HHY5968, registered to 1806 Fallow Ln (the same as the subscriber address used for the PHONE), and a Hyundai SUV registered to Sherry Rene Shepard, which is the same surname as Sheila Shepard's (the subscriber name used for the JENKINS PHONE/**TARGET PREMISES #2**).

25.     On **July 1, 2024**, I conducted a "spot check" of SERVMED/**TARGET PREMISES #1**, where I observed a UPS "Sorry We Missed You" note affixed to the front door of the pharmacy. The note indicated a second attempt at delivery was scheduled for **July 2, 2024**.

26.     On **July 2, 2024**, agents conducting surveillance at SERVMED/**TARGET PREMISES #1** observed JENKINS arrive in the VEHICLE/**TARGET PREMISES #4** and

---

[5] Specifically, I have personally recovered invoices from these wholesalers at pharmacies under investigation for pill-mill activity, which reflected purchasing patterns I know from training and experience match those of pill mills. I also know that Wesley, a wholesaler out of Pennsylvania, recently voluntarily surrendered its DEA Registration in connection with another office's investigation into Wesley's role in facilitating diversion of Commonly Abused Prescription Drugs by Houston area pill mills.

back into a parking space in front of the pharmacy. JENKINS retrieved plastic bags and a pink bag from the trunk of the VEHICLE and entered SERVMED after unlocking the front door.

27.     A short time later, UPS delivered two boxes to SERVMED/**TARGET PREMISES #1**. Later, agents observed JENKINS exiting the pharmacy and placing a black trash bag into the VEHICLE/**TARGET PREMISES #4**, re-entering the pharmacy, and exiting the pharmacy again to place boxes and bags into the VEHICLE. Throughout this time, JENKINS was talking on what appeared to be a cellular telephone. Agents observed JENKINS, still talking on the cell phone, lock the front door of SERVMED, return to the VEHICLE, drive to the dumpster located on the property and discard the black trash bag and boxes into the dumpster, and then leave the area in the VEHICLE.

28.     Among other things, agents recovered from the dumpster a flattened white box displaying the name Safe Chain. Agents also recovered a brown box with a label containing the UPS tracking number 1Z 715 679 24 9111 8605. Records received from Safe Chain confirmed that on June 28, 2024, Safe Chain sent SERVMED an order under the same tracking number that was delivered to SERVMED on July 2, 2024, which contained three pints of promethazine with codeine cough syrup (approaching 300 doses of the drug, assuming what I understand to be a common individual dose of 5 ml). Records from Bloodworth confirmed SERVMED also received 3,000 carisoprodol 350 mg pills and one bottle of promethazine with codeine July 2, 2024, via UPS. I believe those bottles were included in the contents of the bag that I observed JENKINS place into the VEHICLE's trunk.

29.     On **July 17, 2024**, agents conducted surveillance at SERVMED/**TARGET PREMISES #1**. JENKINS arrived in the VEHICLE/**TARGET PREMISES #4** and entered the pharmacy with a pink gym style bag. A UPS delivery truck arrived a short time later and

delivered three large brown boxes to the pharmacy. Approximately thirty minutes after the delivery, JENKINS exited SERVMED with the pink bag under her arm. She placed the pink bag into the trunk of her car and then departed. Agents received records from Wesley Pharmacal, which confirmed that SERVMED RX received three pints of promethazine with codeine, 1,000 carisoprodol 350 mg pills, and 500 pills of alprazolam 2 mg via UPS that day.

30.     A Harris County Precinct 2 Deputy Constable stopped JENKINS in the VEHICLE/**TARGET PREMISES #4** after observing JENKINS failing to use her turn signal where required. The deputy verified JENKINS' identity through a Texas Driver's License bearing TDL # 13529776, which JENKINS provided during the stop. JENKINS also provided her cellular telephone number as 346-579-1272, the phone number associated with the JENKINS PHONE/**TARGET PREMISES #2**. JENKINS was released with a warning for the violation.

31.     On **January 8, 2025**, agents conducting surveillance at SERVMED/**TARGET PREMISES #1** observed JENKINS arrive in the VEHICLE/**TARGET PREMISES #4** at just after 8:30 in the morning. JENKINS walked from the VEHICLE to the front door of the pharmacy, unlocked the door, and entered, all while talking on a cell phone. JENKINS exited the pharmacy around two hours later, got into the VEHICLE, and left. Agents never observed any customers or other persons enter SERVMED that day.

32.     On **January 24, 2025**, agents conducted surveillance at SERVMED/**TARGET PREMISES #1** after receiving information from the SOI that SERVMED would receive a shipment that day from Yavari LLC ("Yavari"), a distributor I know from my own investigations sells Potentiators to pill-mill pharmacies in the Houston area. Around 2:00 that afternoon, I observed a UPS delivery truck arrive and park in front of the pharmacy. A delivery person exited the truck carrying two medium sized brown boxes. JENKINS opened the pharmacy door and

held it open as the delivery driver carried in the two boxes before departing a short time later. Less than half an hour later, I saw JENKINS exit the pharmacy carrying multiple bags and then lock the pharmacy door. JENKINS placed a red bag with black handles and a blue bag into the trunk of the VEHICLE/**TARGET PREMISES #4**, and she placed a purse and a backpack into the rear passenger area before departing.

33.     Agents followed JENKINS to a multi-story business center off the Southwest Freeway, where JENKINS parked the VEHICLE along the curb. Agents then observed Andre WILLIAMS, who I know from conversations with others in law enforcement to be involved in illegal trafficking in pharmaceutical narcotics, exit the business center and make contact with JENKINS. JENKINS exited the VEHICLE and opened the trunk, where WILLIAMS took possession of the red bag with black handles. After a brief conversation with JENKINS, WILLIAMS re-entered the business center carrying the red bag. Less than an hour later, agents observed Kenneth SUMPTER carrying out the same bag that WILLIAMS was observed carrying in. I know from a prior investigation that SUMPTER was one of the individuals illegally buying commonly abused prescription drugs, in bulk, from TX United, a ghosting pharmacy whose owners and pharmacist recently pled guilty to violations of the Controlled Substances Act related to that scheme.

34.     Agents attempted to follow SUMPTER; however, he lost them by driving erratically, making unexplained U-turns and driving at various speeds, which I know from training and experience are techniques used by drug traffickers to thwart what they suspect is surveillance by law enforcement.

### D.  <u>Additional evidence in records obtained from wholesalers</u>

a. **SERVMED's applications to purchase from Bloodworth and Wesley list the SERVMED PHONE/TARGET PREMISES #3 as SERVMED's contact number**

35.     Investigators obtained records from Wesley and Bloodworth, which included SERVMED's applications to purchase controlled drugs from those wholesalers.   Those applications listed SERVMED's contact number as 409-270-5080, which is the number for the SERVMED PHONE/**TARGET PREMISES #3.**

36.     As discussed further below, on or about February 25, 2025 agents obtained subscriber information and the previous 60 days' toll records for the SERVMED PHONE, which showed that the device was registered to PREPAID CUSTOMER at 307 S Friendswood Dr, Friendswood, Texas 77546 (the same address as **TARGET PREMISES #1**), and that it was used during that 60-day timeframe to contact (a) multiple wholesalers that I know sell Potentiators to Houston area pill mills and (b) Monique WASHINGTON; but not (c) the JENKINS PHONE or the VoIP LINE. For those reasons, and as discussed further below, I believe that JENKINS uses the SERVMED PHONE to commit the Target Offenses, and that evidence of the same will be found thereon.

b. **Emails between SERVMED and Wesley show that SERVMED was unconcerned about the non-controlled drugs Wesley required SERVMED to purchase to meet "ratio."**

37.     Based upon my training and experience, I know that Houston area pill-mill pharmacies tend to express few if any preferences about the non-controlled substances their suppliers make them purchase in order to meet imposed controlled-to-non-controlled-drug "ratios." I know from conversations with subject matter experts, including inspectors with TSBP, that legitimate "family" pharmacies tend to purchase a wide variety of drugs (controlled, non-controlled, and over-the-counter), in a variety of strengths, based on what the pharmacies have

in stock and what their customers legitimately need. Based on my training and experience, I know that a legitimate pharmacy would not ask a wholesaler to choose (without the pharmacy's input) the non-controlled drugs to ship the pharmacy.

38.     Investigators obtained emails from Wesley reflecting that Wesley's representatives helped SERVMED meet Wesley's requirement that its pharmacy customers purchased in a 1:1 controlled-to-non-controlled, dollar-for-dollar ratio. The following are examples of SERVMED directing a Wesley representative to select the non-controlled drugs needed to meet that ratio, which I know from training and experience is inconsistent with legitimate pharmacy operations:

| | |
|---|---|
| **April 30, 2024** | |
| SERVMED: | Good morning, do we have anything left this month for controls |
| Wesley: | 1X1000 Carisoprodol 350mg left<br>2x500 Hydrocodone/Apap 10/325mg left |
| SERVMED: | Ok can we order that? |
| Wesley: | Yes, we can do that<br>Should we mat[c]h that up $100.00 in Prescription items?... |
| SERMED: | …you can match it up thank you. |
| | |
| **July 15, 2024** | |
| SERVMED: | [lists order for controlled and non-controlled substances]<br>please send overnight and match what is off… |
| Wesley: | We will match your dollar amounts |
| | |
| **August 5, 2024** | |
| SERVMED: | [lists order for controlled and non-controlled substances]<br>...match for us if we off thank you |
| | |
| **August 20, 2024** | |
| Crawford: | We will need you to add an additional $199.10 in non-controlle[d] drugs. |
| SERVMED: | OK! Do you mind balancing it out for us? |
| | |
| **October 1, 2024** | |
| Wesley: | We will need you to add an additional $62.00 in non controlled drugs to match the dollar amount of your control [sic] drugs. |
| SERVMED: | Ok can you match it for us thank you |

### E. Bank records obtained in the investigation reveal structured cash deposits into the ServMed Account

39.     Investigators have reviewed financial records received from PNC Bank, which revealed significant cash deposits into SERVMED's bank account ending in x4925 (the "ServMed Account"), on which WASHINGTON is the sole signer. From November 2023 through October 2024, at least $311,560 was deposited into the ServMed Account in over 57 transactions ranging from $220 to $8,080.

40.     From my training and experience, I know that drug traffickers generate substantial amounts of cash from their illegal activities, which they often structure (deposit in amounts under $10,000, often in round dollar amounts) to avoid triggering a bank's requirement to report cash transactions over $10,000.

41.     Notably, despite repeated instances of cash deposits being made into the ServMed Account just days (and sometimes hours) apart, the deposit totals often approached—but rarely exceeded—the $10,000 bank reporting threshold for a single day. For example, in a seven-day span in June 2024, $21,000 in cash deposits were made as follows:

| Date | Amount of cash deposit into the ServMed Account |
|------|-------------------------------------------------|
| 6/13/2024 | $6,000 |
| 6/15/2024 | $7,500 |
| 6/20/2024 | $7,500 |

42.     Additionally, there was a $5,900 cash deposit into the ServMed Account on June 27, 2024, just three days after SERVMED received the June 21 and June 24 shipments from distributors I know sell commonly abused prescription drugs to Houston area pill-mill pharmacies, as described above.

43.     The PNC records reflect the use of several bank branches and at least one ATM machine for the Texas-based cash deposits. I believe JENKINS is paid in cash when she diverts drugs shipped to SERVMED. Further, though investigators conducting surveillance have not seen WASHINGTON at SERVMED/**TARGET PREMISES #1**, the PNC records reveal that cash withdrawals are made from the ServMed Account from Georgia, where I know from my investigation WASHINGTON lives.

44.     Based on my training and experience, and on facts I have learned from the investigation about how the DTO operates, I believe these and the many other cash deposits into the ServMed Account derive from the DTO's ghosting pharmacy operations, and are, at least in part, proceeds from illegal drug distribution at SERVMED.

### PROBABLE CAUSE TO BELIEVE EVIDENCE OF THE DTO'S COMMISSION OF THE TARGET OFFENSES WILL BE FOUND ON AND IN THE TARGET PREMISES

#### A. Generally

45.     Based on my training and experience, as outlined above; the facts and circumstances of this investigation; and discussions with experienced investigators in the DEA and other agencies with extensive knowledge of the methods and practices of individuals trafficking in or diverting pharmaceutical controlled substances, I know that persons involved in drug diversion and trafficking (and related money laundering) often maintain and retain in their possession, often for several years, at locations they control, including residences, businesses, vehicles, electronic devices (phones and computers) and other locations, the following:

   a.     Large amounts of currency and/or cryptocurrency, for safekeeping, to finance their ongoing illegal activities and other businesses, in order to have immediate access to cash, and to avoid the reporting requirements of banks and other financial institutions;

   b.     Controlled and non-controlled drugs;

c.      Money counters, denomination bands, ledgers, adding machines, and other items used in processing and storing large amounts of U.S. currency;

d.      Items of significant monetary value, including cryptocurrency receptacles, jewelry, and automobiles, which I know persons involved in trafficking and diverting controlled substances frequently purchase with cash proceeds of their crimes, in order to conceal the source, nature, and/or location of those proceeds;

e.      Records[6] evidencing purchases using cash proceeds of their crimes, such records including paper title, receipts, ledgers, and real estate documents, and those relating to cryptocurrency;

f.      Records and information relating the use of legitimate financial and banking institutions, including bank accounts, certificates of deposit, stocks, mutual funds, and safe deposit boxes, that often contain proceeds of illegal activities, and/or which are used to commingle illegal funds with legitimate funds and earnings in an effort to legitimize the source of these illegal funds or disguise the existence of these illegal funds;

g.      Other records of drug sales and transactions and information relating to obtaining, transferring, and spending proceeds of drug diversion and trafficking activities, including records (both real and falsified) relating to and reflecting the use of shell companies and business fronts, which drug traffickers and their associates often establish to attempt to legitimize their illegal earnings;

h.      Records that establish control of various premises, including residences and business premises, including utility bills, cancelled checks, envelopes, deeds, leases, titles, and vehicle registrations;

i.      Records relating to the purchase and sale of medical and pharmaceutical drugs, equipment, and supplies, and business and professional contracts and agreements related to the same;

j.      Records relating to the preparation and filing of federal corporate and individual income tax returns as well as records related to income, expenses, deductions and credits such as Forms W-2, Forms 1098, Forms 1099, receipts, invoices, bank statements, bank deposit slips, bank withdrawal slips, credit card statements, books and records, account ledgers, receipts, notes, journals and other documents relating to financial transactions;

k.      Records containing or relating to names, addresses, phone numbers, email addresses, and personal information of co-conspirators, associates, subordinates,

---

[6] The term "records," used throughout this Section, includes all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including computers and any other electrical, electronic, or magnetic form, such as any information on an electronic or magnetic storage device, including hard disks, CDs, DVDs, optical discs, thumb drives, smart cards, memory calculators, computer tablets, smart phones, computers, as well as readouts or printouts from any magnetic storage device, any handmade form, any mechanical form, and any photographic form.

employees, and others who join, aid, and abet drug diversion and trafficking, including address books, electronic organizers, cellular phones and smart phones, diaries, planners, notebooks, and other physical and electronic storage locations;

l.      Records of purchasing and dispensing controlled drugs that Texas pharmacies are required by law to keep. In my training and experience, I know that pharmacies keep these types of records on paper, electronically on computers, and in other electronic formats. I also know based on my training and experience that pharmacy owners and managers often transport such records and documents—both in paper and electronic format, on laptops and other electronic storage devices—in their vehicles to and from their residences and business offices, to review and update these records; and

m.      Photographs of themselves and their criminal associates, which reveal directly and indirectly their criminal associations and illegal activities.

46.      I also know from training and experience that pill-mill pharmacies and their operators normally conduct business online, which they do using smart phones like the JENKINS and SERVMED PHONES/**TARGET PREMISES #2** and **#3** and laptop and/or desktop computers, which I believe are likely be found at/in **TARGET PREMISES #1** and **#4**. In particular, in addition to the **TARGET PREMISES**-specific reasons listed in the following Subsections, I believe that digital evidence of the Target Offenses will be found at, on, and in the **TARGET PREMISES** because:

a.  I know that TSBP, DEA, and wholesalers communicate with pharmacy owners through email, and that all three entities enable pharmacies to submit documents and (in the case of the wholesalers) place orders through online portals. In addition, I know that ghosting pharmacy owners and operators often use computers to generate false paperwork to give the appearance of legitimate operations, and that the computers used to generate such paperwork are often kept at locations the owners/operators control other than the pharmacy itself, in case law enforcement or oversight agencies audit or search the pharmacy;

b.  I know that SERVMED/**TARGET PREMISES #1** is sometimes not open during normal business hours. As such, I believe it is likely that JENKINS and possibly other members of the DTO conduct the pharmacy's communications and other pharmacy business on devices kept on and/or in premises they control off the pharmacy premises, such as the VEHICLE/**TARGET PREMISES #4** and/or the SERVMED and JENKINS PHONES/**TARGET PREMISES #2** and **#3**, in addition to devices kept in SERVMED/**TARGET PREMISES #1**.

c. I know that persons involved in controlled-pharmaceutical and illicit-drug diversion and trafficking frequently use different cellular phones for communications with wholesalers, customers, pharmacists, clinics, doctors; and drug traffickers; that they often send photographs to partners in crime to show what pharmaceutical medications are available to purchase, along with text messages containing price lists; and that they frequently brag on social media platforms about their drugs, money, and luxury items, like cars purchased with drug proceeds, often including incriminating photos of these items, which are taken with and stored on their phones; and

d. I know that persons involved in controlled-pharmaceutical and illicit-drug diversion and trafficking frequently use capabilities on their cellular phones that allow them to serve as wireless telephones, digital cameras, portable media players, and GPS navigation devices, and that they store data corresponding to these and other applications; all of which I know from training and experience can, through the examination of such data, uncover evidence, including that which reveals or suggests who possessed or used the device.

47. I also know from training and experience that drug traffickers often keep on their persons, or within reach of their persons, more than one cellular phone which they use in a manner designed to thwart law enforcement efforts. It is common to find that one cellular phone is registered and subscribed under the trafficker's true identity, which the trafficker uses to conduct legal or personal business (sometimes called a "clean" phone), while the other is a "burner phone" registered to a fictitious identity and is used to conduct illegal business (sometimes called a "dirty" phone). The same can be true of a single "smart" phone or other device with one phone number/application used for one purpose and a different phone number/application used for another purpose.

48. Based on my training and experience, and on comparisons of the contents of "clean" and "dirty" phones I have conducted in previous narcotics investigations, I know that proof of use of phones in this manner, which requires analysis of the contents of both the "clean" and the "dirty" phone, provides powerful evidence of the trafficker's consciousness that the activities taking place on the "dirty" phone are in fact illegal. Thus, while the warrant requested would specifically authorize the search and seizure of the JENKINS PHONE/**TARGET**

**PREMISES #2** and the SERVMED PHONE/**TARGET PREMISES #3**, it would also authorize the search and seizure of any other cellular phones found on or nearby JENKINS at **TARGET PREMISES #1** and/or **TARGET PREMISES #4**, and that agents reasonably believe to be used by JENKINS.

49.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information, by whatever means necessary as consistent with the warrant.

### B. <u>Evidence Specific to TARGET PREMISES #1.</u>

50.     **TARGET PREMISES #1** is further described and depicted in Attachment A-1, which is incorporated by reference into this affidavit. This section incorporates by reference the above paragraphs.

51.     On February 27, 2025, agents contacted TSBP and verified that SERVMED was still licensed to operate at 307 S Friendswood Drive, Ste D-1, Friendswood, Texas, 77546 (**TARGET PREMISES #1**).

52.     Agents obtained from the building management company the August 2023 Commercial Lease Agreement listing Monique WASHINGTON as the tenant at SERVMED/**TARGET PREMISES #1**. Paragraph 36 of the lease lists WASHINGTON's phone number as 770-630-4277 and email as Monique.johnson0404@gmail.com. The document was signed by Monique WASHINGTON, as owner for ServMed Rx LLC, on September 1, 2023.

53.     Again, JENKINS is not listed on the paperwork related to SERVMED/**TARGET PREMISES #1**. However, surveillance as recent as the late January 2025 instance described above has confirmed she continues to operate the pharmacy on the DTO's behalf.

### C.   Evidence Specific to TARGET PREMISES #2, #3, and the VoIP LINE.

54.     The JENKINS PHONE/**TARGET PREMISES #2** is further described and depicted in Attachment A-2, which is incorporated by reference into this affidavit. This section incorporates by reference the above paragraphs.

55.     To correctly identify **TARGET PREMISES #2**, DEA and other law enforcement agencies have searched various databases and public records, which reveal that 346-579-1272 is used by JENKINS. I and other agents have corroborated this information, including by confirming with the Harris County deputy who conducted the stop of JENKINS described above, that JENKINS provided this as her number during that stop.

56.     Agents have obtained and analyzed toll records for the number associated with the JENKINS PHONE, 346-579-1272, and for telephone numbers used by Monique WASHINGTON (SERVMED owner) and Ronald Kevin Patrick (listed with TSBP as SERVMED's current PIC). Agents did not see any communications between WASHINGTON, JENKINS, and Patrick from their individual contact telephones; however, analysis of WASHINGTON's number, 404-558-3098, revealed contact between WASHINGTON and the VoIP LINE, 346-313-8575, for which agents have not obtained tolls,[7] but which agents believe

---

[7] I know from my training and experience that drug traffickers and persons involved in criminal activity prefer to use VoIP phone services because doing so offers them an encrypted medium that limits law enforcement's successful use of investigative tactics. I know from my conversations with DEA Intelligence Analysts that it is very difficult to obtain toll records relating to VoIP lines, including because host companies typically use a third-party company for subpoena compliance. I am aware of instances where, after agents sought records related to a VoIP line, an investigation was divulged to targets, which then directly affected or hindered the investigation. I therefore believe that traffickers often attempt to thwart

JENKINS is accessing over an application like WhatsApp or Ring Central on the JENKINS

PHONE/**TARGET PREMISES #2**, the SERVMED PHONE/**TARGET PREMISES #3**, or

another device that JENKINS uses for that purpose. In particular,

a. JENKINS has been observed on numerous surveillances as the only person at the pharmacy receiving packages. She is almost always observed talking on a cellular phone. Yet, agents found no contact between the JENKINS PHONE and WASHINGTON, or any wholesalers known to be shipping the packages JENKINS receives at the pharmacy;

b. WASHINGTON provided TSBP 346-313-8575, the VoIP LINE, as the business phone for SERVMED, and WASHINGTON's toll records reflect hits with the VoIP LINE. Toll analysis from January 8, 2025, through February 10, 2025, shows there were 21 contacts between WASHINGTON and the VoIP line, with the last contact being on January 28, 2025.

c. Agents identified no communication between the JENKINS PHONE/**TARGET PREMISES #2**, WASHINGTON, and Patrick; and found only one date when the SERVMED PHONE/**TARGET PREMISES #3** had contact with the VoIP LINE or WASHINGTON (and none with Patrick), which is unexpected given their roles as owner (WASHINGTON), PIC (Patrick), and apparent operator (JENKINS) at SERVMED; and

d. I believe that it is particularly unusual not to see contact between WASHINGTON/JENKINS and Patrick because I believe Patrick lives in the Dallas Metro area and WASHINGTON lives in Georgia, and therefore it is unlikely they communicate in person and quite likely they communicate by phone or text: Although he is listed with TSBP as PIC, agents conducting surveillance have never observed Patrick at SERVMED. Agents have searched several law enforcement databases, which show Patrick's most recent residential addresses are in the Dallas Metro area, and that he is currently employed at Life Anew in McKinney, Texas. TWC shows Patrick is currently working for Pharmerica Professional Services, which the company's website identifies as a pharmacy management and clinical consulting service for healthcare settings.

57. Though JENKINS does not appear to use the number subscribed to the PHONE

(346-579-1272) to communicate with wholesalers or on-paper associates of SERVMED,

JENKINS does use that number to communicate with other suspected drug traffickers, including

---

law enforcement efforts in tracking information commonly provided by cellular phone companies by subpoena by using VoIP lines.

Andre WILLIAMS:[8] Between January 8, 2025, and February 10, 2025, the PHONE and WILLIAMS had a total of 255 contacts (7 calls and 248 text messages, with the last text message occurring on January 27, 2025).

58.     The number subscribed to the PHONE (346-579-1272) also had contact with a UPS delivery driver, identified as Scott Holtje. I learned from my investigation that Holtje is assigned to the League City Office, whose area of responsibility includes SERVMED/**TARGET PREMISES #1**. Between January 8, 2025, and February 10, 2025, there were 129 such contacts (2 calls and 127 text messages, with the last text message occurring on January 23, 2025).

59.     Accordingly, I have probable cause to believe that JENKINS, WASHINGTON, and other members of the DTO are committing the Target Offenses and that evidence of those offenses will be found on the JENKINS PHONE/**TARGET PREMISES #2** and the SERVMED PHONE/**TARGET PREMISES #3**.

### D.  Evidence Specific to TARGET PREMISES #4.

60.     In addition to agents' observations while conducting the surveillance described above, and the fact that ServMed's license and registration remain active, agents have analyzed ServMed's receipt in January and February 2025 of UPS packages from wholesalers I know sell Potentiators to Houston area pill-mill pharmacies. This analysis showed that UPS made at least one such delivery to ServMed/**TARGET PREMISES #1** per week for those months. Therefore, I submit that there is probable cause to believe that ServMed/**TARGET PREMISES #1** will receive at least one such package between today, March 3, 2025 and Saturday, March 15, 2025.

---

[8] There was a hit in one of DEA's tools used by law enforcement for deconfliction, that showed WILLIAMS' phone was identified by another DEA group as a number being used to traffic drugs.

61. The week of March 3, 2025, investigators plan to observe JENKINS receiving at SERVMED/**TARGET PREMISES #1** one or more packages from one or more wholesalers that I know sell Potentiators to Houston area pill mills; and then departing in the VEHICLE, as investigators have observed on several occasions described above.

62. The warrant I request for the VEHICLE/**TARGET PREMISES #4** (but not, to be clear, three other **TARGET PREMISES**, for which I submit there is probable cause without the occurrence of any CONDITIONS as defined below) is therefore anticipatory, and, as set forth below, there is probable cause to believe that certain triggering conditions will occur, and that if these conditions occur, there is a fair probability that the evidence, fruits, instrumentalities, and contraband of the Target Offenses will be found on and in the VEHICLE/**TARGET PREMISES #4**.[9] Specifically, the triggering conditions as to the warrant for the VEHICLE/**TARGET PREMISES #4** are as follows (the "CONDITIONS"):

   a. On a date between on or about March 3, 2025 and on or about March 15, 2025, investigators will learn from the SOI or another carrier representative that SERVMED/**TARGET PREMISES #1** is to receive a package or packages from one or more of the following wholesalers—Yavari, South Pointe Wholesale Inc. ("South Pointe"), ParagonMeds ("Paragon"), Bloodworth, Quantum Commerce ("Quantum"), R&S Northeast, LLC ("Dixon Shane"), and Safe Chain—all of which I know from my own investigations are wholesalers that sell Potentiators to Houston area pill mills;

   b. Investigators will establish surveillance and observe the carrier deliver the package or packages to JENKINS at SERVMED/**TARGET PREMISES #1**;

   c. JENKINS will leave SERVMED/**TARGET PREMISES #1** in the VEHICLE/**TARGET PREMISES #4** and be stopped by law enforcement for execution of the warrant.

---

[9] An anticipatory warrant may issue upon a showing that (1) "there is a fair probability that contraband or evidence of a crime will be found in a particular place," and (2) "there is probable cause to believe the triggering condition will occur." *United States v. Grubbs*, 547 U.S. 90, 96-97 (2006); *accord United States v. Lyons*, No. 22-30409, 2023 WL 4532804, at *3 (5th Cir. July 13, 2023).

63.     The warrant sought would authorize investigators to open the containers in the VEHICLE/**TARGET PREMISES #4** and, to seize the JENKINS PHONE/**TARGET PREMISES #2**, the SERVMED PHONE/**TARGET PREMISES #3**, and any other devices found in the VEHICLE, and to examine their contents.

### E.  Technical Information

64.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

65.     *Forensic evidence.* As further described in Attachments B-1 through B-4, these applications seek permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrants, but also forensic evidence that establishes how the JENKINS PHONE, the SERVMED PHONE (**TARGET PREMISES #2** and **#3**) and any other devices that fall within the scope of the warrants for SERVMED/**TARGET PREMISES #1** and the VEHICLE/**TARGET PREMISES #4**, were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on such devices because:

- Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

- Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

- A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

• The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

• Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

66. The warrants I am applying for would also permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those

of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at or in **TARGET PREMISES #1** and/or **#4** and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

h. Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would

permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## REVIEW OF POTENTIALLY PRIVILEGED MATERIALS

67.    Based upon my review of evidence obtained over the course of the investigation, I have no specific reason to believe that the proposed search will yield privileged information. I have no direct knowledge that JENKINS is, or has been, represented by an attorney in connection with this investigation. However, to protect any privilege that may exist, and to avoid exposure to potentially privileged information, agents will conduct their search in accordance with the filter review procedures set forth in Attachments B-1 through B-4.

## CONCLUSION

68.    I submit that the evidence discussed here provides probable cause to believe that JENKINS and the DTO have committed, and are committing, the Target Offenses, and that evidence, fruits, instrumentalities, and contraband of the same will be found at, in, and on the **TARGET PREMISES**.

Respectfully submitted,

Michael E. Henson
Task Force Officer
U.S. Drug Enforcement Administration

Subscribed and sworn to before me on this the 4th day of March, 2025, and I find probable cause.

HONORABLE YVONNE HO
 UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF TEXAS

**TARGET PREMISES #1 – SERVMED RX PHARMACY**

**Address:** 307 S Friendswood Drive, Suite D1, Friendswood, Texas 77546

**Narrative Description:** TARGET PREMISES #1 is a pharmacy located in a single-story brick building in a strip center. The door is marked with "307-D1" and "SERVMED RX PHARMACY" in white lettering.




## Attachment A-2

The JENKINS PHONE/**TARGET PREMISES #2** – A T-Mobile phone with IMSI 310260404178803, subscribed to Sheila Shepard, with phone number 346-579-1272, and which may also be used to access a VoIP line with number 346-313-8575. This warrant authorizes the forensic examination of the JENKINS PHONE, for the purpose of identifying the electronically stored information described in Attachment B-2.

## Attachment A-3

The SERVMED PHONE/**TARGET PREMISES #3** – A cellular phone with AT&T phone number 409-270-5080 and IMSI 310280079454066, subscribed to PREPAID CUSTOMER at 307 S Friendswood Dr, Friendswood, Texas 77546, and which may also be used to access a VoIP line with number 346-313-8575. This warrant authorizes the forensic examination of the SERVMED PHONE, for the purpose of identifying the electronically stored information described in Attachment B-3.

## Attachment A-4

**TARGET PREMISES #4 –** A GRAY 2015 BMW 528, PLATE #PYN6831, REGISTERED TO
SHALANNA JENKINS. TARGET PREMISES #4 is a gray 2015 BMW four door sedan with
Texas license plate PYN 6831, VIN # WBA5A7C58FG142807.





## I.     ITEMS TO BE SEIZED FROM TARGET PREMISES #1, SERVMED

The items to be seized from **TARGET PREMISES #1**, SERVMED, as described in Attachment A-1, are the following, which constitute evidence, fruits, instrumentalities, and contraband of violations of the Controlled Substances Act, including: 21 U.S.C. § 841 (Distribution of Controlled Substances); 21 U.S.C. § 846 (Conspiracy to Distribute Controlled Substances), 21 U.S.C. § 856(a)(2) (Maintaining a Drug-Involved Premises); and 18 U.S.C. §§ 1956 and 1957 (Money Laundering and Money Laundering Conspiracy) (collectively, the "Target Offenses"), and involving SHALANNA JENKINS, MONIQUE WASHINGTON, RONALD PATRICK, SERVMED, and others known and unknown involved in the commission of the Target Offenses, occurring on or after January 11, 2022:

1. **Records related to, or purporting to reflect, the practice of medicine or pharmacy**, including prescriptions; patient files; scheduling records; patient sign-in sheets, patient visit logs, signature logs, and counseling logs; correspondence with patients, telephone messages, telephone message pads, and records of communication with or about patients or providers; daily dispensing logs and daily inventory logs; patient forms and consent forms; insurance records, including records of communications with insurance companies, insurance pre-authorization records, insurance enrollment records, insurance claims, and insurance payments; and any other records related to the dispensing, distributing, or return of controlled substances.

2. **Controlled substances**, including oxycodone, hydrocodone, carisoprodol, alprazolam, and promethazine with codeine.

3. **Non-controlled substances**, including promethazine without codeine.

4. **Compliance records**, including pharmacy and clinic licenses and certifications; policies and procedures; audit records; and communications with, about, or relating to the work of oversight agencies; and any records required to be kept under federal or state law, including DEA Forms 222.

5. **Records of operations**, including those relating to or reflecting purchasing, prescribing, reporting, distributing, and dispensing controlled and non-controlled substances, including invoices, order forms, credit memos, and correspondence with drug wholesale distributors, manufacturers, clinics, and pharmacies.

6. **Corporate and business records**, including articles of incorporation, resolutions, records regarding officers' duties and responsibilities, licensing records, property records, corporate structure records, records of control and ownership interests,

business agreements and contracts, lease agreements, equipment rental agreements, and agreements with vendors, business partners, and affiliates, including wholesalers, labs, diagnostic testing facilities, clinics, medical providers, and staffing companies.

7. **Financial records**, including those constituting, reflecting, or relating to bills, tax records, invoices, purchase orders, booking ledgers, real estate, investments, retirement accounts, bank and brokerage accounts, checks, wire transfers, check registers, canceled checks, deposit tickets, and records of transfer, safe deposit boxes, and records of other assets or items evidencing money, assets, wealth, or other items of value involved in or traceable to drug diversion and trafficking. Such records further include those relating to any financial instrument and any exchange of anything of value; and records reflecting or revealing the locations of funds and any items of value, and records thereof.

8. **Currency and items of value**, including cash and cryptocurrency and related devices and containers, denomination bands, precious metals, and jewelry.

9. **Tax-related records**.

10. **Personnel and payroll records**, including employee lists; documents reflecting names, addresses, and duration of employment; personnel files; disciplinary records; pay schedules and payroll documents; work schedules, time sheets, appointment books; notes of communications with patients, providers, callers, or visitors; records showing the services provided by and all payments made to, from, or for pharmacists, pharmacy technicians, pharmacy technician-trainees, and other persons providing pharmacy or health-related services; and records reflecting the use consultants and staffing agencies, physician and practitioner finders, temp agencies, and any individual or company assisting in the location of pharmacy providers or staff.

11. **Records of communications**, including records reflecting or constituting, in draft, final, and any other form, personal diaries and letters; correspondence to, from, and between owners, providers, employees, patients, and individuals transporting patients or prescriptions; and transmissions by text message, iMessage, messaging application, facsimile, and e-mail (including attachments), reflecting or relating to exchanges between or involving any of the business owners, employees, agents, representatives, wholesalers, and customers.

12. **Images and videos**.

13. **Calendars**, appointment books, telephone message pads, day planners, logs, correspondence, rolodexes, emails, and address books.

14. **Electronic equipment**, including computers, smart phones (including cellular telephones and SIM cards or other portable memory chips used to transfer information between cell phones), USB and other external or internal hard drives, flash drives; and anything reflecting or constituting passwords, encryption keys, and other access devices that may be necessary to access electronic equipment and any data contained on electronic equipment.

## II.     WHATEVER FORM

Any information described in the preceding paragraphs includes evidence in whatever form and by whatever means created or stored, including, but not limited to, deleted items, drafts, and items maintained in trash or other folders; electronic and magnetic media; electronic data processing and storage devices; computers and computer systems; mobile devices, tablets, and smart phones; thumb drives, network attached storage, optical storage devices such as CD/DVD/Blu-Ray, and any computer relationship operational equipment; any and all records showing or bearing indicia of the use, ownership, possession or control of any of the same; and video/audio recordings, including those recorded on the pharmacy's video/audio surveillance system, together with system documentation, operating logs, and software and instruction manuals.

## III.     ADDITIONAL DETAIL RELATING TO COMPUTERS

For any smart phone, computer, or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (any such thing a "COMPUTER"):

1. **Attribution evidence**, including evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence; software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software; and evidence of the lack of such malicious software that might allow others to control the COMPUTER.

2. **Access evidence**, indicating how and when the COMPUTER was accessed or used, or how and when storage devices or other devices were attached the COMPUTER to upload or download material, to determine the chronological context of computer access, use, and events relating to crime under investigation and to the COMPUTER user and the user's state of mind.

3. **Security evidence**, including passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER.

4. **Internet Protocol addresses** used by the COMPUTER and information reflecting and relating to the same.

5. **Internet activity records**, including the COMPUTER's firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

6. **Other contextual information** necessary to understand the foregoing evidence.

### IV.     COMPELLED BIOMETRICS

During the execution of the search of **TARGET PREMISES #1** described in Attachment A-1, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual, who is found at **TARGET PREMISES #1** and who is reasonably believed by law enforcement to be a user of a device within the scope of the warrant found at the premises, to the fingerprint scanner of the device; (2) hold a device found at **TARGET PREMISES #1** in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

### V.     SEARCH PROCEDURES FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION

1. The seized material is not expected to contain potentially privileged information (material that may potentially be protected by the attorney-client privilege, the attorney work product doctrine, or other recognized privilege or protection).

2. However, if potentially privileged material is encountered, the following procedures will be followed.

3. These procedures will be executed by: (a) law enforcement personnel conducting the investigation and search and other individuals assisting law enforcement personnel in the search, including any prosecutor participating in the investigation (the "Search Team") and (b) the Special Matters Unit ("SMU") of the Criminal Division, Fraud Section. SMU attorneys and support staff are not and will not become part of the prosecution team and have a separate reporting chain from the prosecution team.

4. If, during its review of the material identified above, the Search Team determines that a document appears to contain potentially privileged material, the Search Team will discontinue its review and will notify the SMU.

5. The data that may contain potentially privileged material will be transferred to the SMU.

6. An SMU attorney may review the data containing potentially privileged material. If the SMU attorney determines that the data does not contain potentially privileged material, the document may be returned to the Search Team. If the SMU attorney determines that material is potentially privileged, the SMU attorney may do any of the following: (a) apply ex parte to the court for a determination whether or not the material contains privileged information; (b) defer seeking court intervention and instead segregate the material in a manner that makes it inaccessible to the search

team; or (c) disclose the material to the potential privilege holder, request a privilege log if the potential privilege holder asserts privilege, and seek a ruling from the court regarding the material if the parties cannot reach agreement.

I.     **ITEMS TO BE SEIZED FROM TARGET PREMISES #2**

All records on **TARGET PREMISES #2**, as described in Attachment A-2, which constitute evidence, fruits, instrumentalities, and contraband of violations of the Controlled Substances Act, including: 21 U.S.C. § 841 (Distribution of Controlled Substances); 21 U.S.C. § 846 (Conspiracy to Distribute Controlled Substances), 21 U.S.C. § 856(a)(2) (Maintaining a Drug-Involved Premises); and 18 U.S.C. §§ 1956 and 1957 (Money Laundering and Money Laundering Conspiracy) (collectively, the "Target Offenses"), and involving SHALANNA JENKINS, MONIQUE WASHINGTON, RONALD PATRICK, SERVMED, and others known and unknown involved in the commission of the Target Offenses, occurring on or after January 11, 2022:

1. **Records related to, or purporting to reflect, the practice of medicine or pharmacy**, including prescriptions; patient files; scheduling records; patient sign-in sheets, patient visit logs, signature logs, and counseling logs; correspondence with patients, telephone messages, telephone message pads, and records of communication with or about patients or providers; daily dispensing logs and daily inventory logs; patient forms and consent forms; insurance records, including records of communications with insurance companies, insurance pre-authorization records, insurance enrollment records, insurance claims, and insurance payments; and any other records related to the dispensing, distributing, or return of controlled substances.

2. **Records related to controlled substances**, including oxycodone, hydrocodone, carisoprodol, alprazolam, and promethazine with codeine.

3. **Records related to non-controlled substances**, including promethazine without codeine.

4. **Compliance records**, including pharmacy and clinic licenses and certifications, policies and procedures, audit records, and communications with, about, or relating to the work of oversight agencies, and any records required to be kept under federal or state law, including DEA Forms 222.

5. **Records of operations**, including those relating to or reflecting purchasing, prescribing, reporting, distributing, and dispensing controlled and non-controlled substances, including invoices, order forms, credit memos, and correspondence with drug wholesale distributors, manufacturers, clinics, and pharmacies.

6. **Corporate and business records**, including articles of incorporation, resolutions, records regarding officers' duties and responsibilities, licensing records, property

records, corporate structure records, records of control and ownership interests, business agreements and contracts, lease agreements, equipment rental agreements, and agreements with vendors, business partners, and affiliates, including wholesalers, labs, diagnostic testing facilities, clinics, medical providers, and staffing companies.

7. **Financial records**, including those constituting, reflecting, or relating to bills, tax records, invoices, purchase orders, booking ledgers, real estate, investments, retirement accounts, bank and brokerage accounts, checks, wire transfers, check registers, canceled checks, deposit tickets, and records of transfer, safe deposit boxes, and records of other assets or items evidencing money, assets, wealth, or other items of value involved in or traceable to drug diversion and trafficking. Such records further include those relating to any financial instrument and any exchange of anything of value; and records reflecting or revealing the locations of funds and any items of value, and records thereof.

8. **Currency and items of value**, including cash and cryptocurrency and related devices and containers, denomination bands, precious metals, and jewelry.

9. **Tax-related records**.

10. **Personnel and payroll records**, including employee lists; documents reflecting names, addresses, and duration of employment; personnel files; disciplinary records; pay schedules and payroll documents; work schedules, time sheets, appointment books; notes of communications with patients, providers, callers, or visitors; records showing the services provided by and all payments made to, from, or for pharmacists, pharmacy technicians, pharmacy technician-trainees, and other persons providing pharmacy or health-related services; and records reflecting the use consultants and staffing agencies, physician and practitioner finders, temp agencies, and any individual or company assisting in the location of pharmacy providers or staff.

11. **Records of communications**, including records reflecting or constituting, in draft, final, and any other form, personal diaries and letters; correspondence to, from, and between owners, providers, employees, patients, and individuals transporting patients or prescriptions; and transmissions by text message, iMessage, messaging application, facsimile, and e-mail (including attachments), reflecting or relating to exchanges between or involving any of the business owners, employees, agents, representatives, wholesalers, and customers.

12. **Records related to calendars**, appointment books, telephone message pads, day planners, logs, correspondence, rolodexes, emails, and address books.

## II.   ATTRIBUTION, ACCESS, OTHER CONTEXTUAL EVIDENCE

Evidence of any of the following found on or in **TARGET PREMISES #2**:

1. **Attribution**, including evidence of who used, owned, or controlled **TARGET PREMISES #2** at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence; software that would allow others to control **TARGET PREMISES #2**, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software; and evidence of the lack of such malicious software that might allow others to control **TARGET PREMISES #2**.

2. **Access**, indicating how and when **TARGET PREMISES #2** was accessed or used, or how and when storage devices or other devices were attached to **TARGET PREMISES #2** to upload or download material, to determine the chronological context of computer access, use, and events relating to crime under investigation and to **TARGET PREMISES #2**'s user and the user's state of mind.

3. **Security**, including passwords, encryption keys, and other access devices that may be necessary to access **TARGET PREMISES #2**.

4. **Internet Protocol addresses** used by **TARGET PREMISES #2** and information reflecting and relating to the same.

5. **Internet activity records**, including **TARGET PREMISES #2**'s firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

6. **Other contextual information** necessary to understand the foregoing evidence.

## III.   WHATEVER FORM

As used above, the terms "records" and "information" include all the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

## IV.   COMPELLED BIOMETRICS

Law enforcement personnel are authorized to (1) press or swipe JENKINS' fingers (including thumbs) to the fingerprint scanner of **TARGET PREMISES #2**; and/or (2) hold **TARGET PREMISES #2** in front of her face and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

## V. SEARCH PROCEDURES FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION

1. The seized material is not expected to contain potentially privileged information (material that may potentially be protected by the attorney-client privilege, the attorney work product doctrine, or other recognized privilege or protection).

2. However, if potentially privileged material is encountered, the following procedures will be followed.

3. These procedures will be executed by: (a) law enforcement personnel conducting the investigation and search and other individuals assisting law enforcement personnel in the search, including any prosecutor participating in the investigation (the "Search Team") and (b) the Special Matters Unit ("SMU") of the Criminal Division, Fraud Section. SMU attorneys and support staff are not and will not become part of the prosecution team and have a separate reporting chain from the prosecution team.

4. If, during its review of the material identified above, the Search Team determines that a document appears to contain potentially privileged material, the Search Team will discontinue its review and will notify the SMU.

5. The data that may contain potentially privileged material will be transferred to the SMU.

6. An SMU attorney may review the data containing potentially privileged material. If the SMU attorney determines that the data does not contain potentially privileged material, the document may be returned to the Search Team. If the SMU attorney determines that material is potentially privileged, the SMU attorney may do any of the following: (a) apply ex parte to the court for a determination whether or not the material contains privileged information; (b) defer seeking court intervention and instead segregate the material in a manner that makes it inaccessible to the search team; or (c) disclose the material to the potential privilege holder, request a privilege log if the potential privilege holder asserts privilege, and seek a ruling from the court regarding the material if the parties cannot reach agreement.

## I.     ITEMS TO BE SEIZED FROM TARGET PREMISES #3

All records on **TARGET PREMISES #3**, as described in Attachment A-3, which constitute evidence, fruits, instrumentalities, and contraband of violations of the Controlled Substances Act, including: 21 U.S.C. § 841 (Distribution of Controlled Substances); 21 U.S.C. § 846 (Conspiracy to Distribute Controlled Substances), 21 U.S.C. § 856(a)(2) (Maintaining a Drug-Involved Premises); and 18 U.S.C. §§ 1956 and 1957 (Money Laundering and Money Laundering Conspiracy) (collectively, the "Target Offenses"), and involving SHALANNA JENKINS, MONIQUE WASHINGTON, RONALD PATRICK, SERVMED, and others known and unknown involved in the commission of the Target Offenses, occurring on or after January 11, 2022:

1. **Records related to, or purporting to reflect, the practice of medicine or pharmacy**, including prescriptions; patient files; scheduling records; patient sign-in sheets, patient visit logs, signature logs, and counseling logs; correspondence with patients, telephone messages, telephone message pads, and records of communication with or about patients or providers; daily dispensing logs and daily inventory logs; patient forms and consent forms; insurance records, including records of communications with insurance companies, insurance pre-authorization records, insurance enrollment records, insurance claims, and insurance payments; and any other records related to the dispensing, distributing, or return of controlled substances.

2. **Records related to controlled substances**, including oxycodone, hydrocodone, carisoprodol, alprazolam, and promethazine with codeine.

3. **Records related to non-controlled substances**, including promethazine without codeine.

4. **Compliance records**, including pharmacy and clinic licenses and certifications, policies and procedures, audit records, and communications with, about, or relating to the work of oversight agencies, and any records required to be kept under federal or state law, including DEA Forms 222.

5. **Records of operations**, including those relating to or reflecting purchasing, prescribing, reporting, distributing, and dispensing controlled and non-controlled substances, including invoices, order forms, credit memos, and correspondence with drug wholesale distributors, manufacturers, clinics, and pharmacies.

6. **Corporate and business records**, including articles of incorporation, resolutions, records regarding officers' duties and responsibilities, licensing records, property

records, corporate structure records, records of control and ownership interests, business agreements and contracts, lease agreements, equipment rental agreements, and agreements with vendors, business partners, and affiliates, including wholesalers, labs, diagnostic testing facilities, clinics, medical providers, and staffing companies.

7. **Financial records**, including those constituting, reflecting, or relating to bills, tax records, invoices, purchase orders, booking ledgers, real estate, investments, retirement accounts, bank and brokerage accounts, checks, wire transfers, check registers, canceled checks, deposit tickets, and records of transfer, safe deposit boxes, and records of other assets or items evidencing money, assets, wealth, or other items of value involved in or traceable to drug diversion and trafficking. Such records further include those relating to any financial instrument and any exchange of anything of value; and records reflecting or revealing the locations of funds and any items of value, and records thereof.

8. **Currency and items of value**, including cash and cryptocurrency and related devices and containers, denomination bands, precious metals, and jewelry.

9. **Tax-related records**.

10. **Personnel and payroll records**, including employee lists; documents reflecting names, addresses, and duration of employment; personnel files; disciplinary records; pay schedules and payroll documents; work schedules, time sheets, appointment books; notes of communications with patients, providers, callers, or visitors; records showing the services provided by and all payments made to, from, or for pharmacists, pharmacy technicians, pharmacy technician-trainees, and other persons providing pharmacy or health-related services; and records reflecting the use consultants and staffing agencies, physician and practitioner finders, temp agencies, and any individual or company assisting in the location of pharmacy providers or staff.

11. **Records of communications**, including records reflecting or constituting, in draft, final, and any other form, personal diaries and letters; correspondence to, from, and between owners, providers, employees, patients, and individuals transporting patients or prescriptions; and transmissions by text message, iMessage, messaging application, facsimile, and e-mail (including attachments), reflecting or relating to exchanges between or involving any of the business owners, employees, agents, representatives, wholesalers, and customers.

12. **Records related to calendars**, appointment books, telephone message pads, day planners, logs, correspondence, rolodexes, emails, and address books.

## II.    ATTRIBUTION, ACCESS, OTHER CONTEXTUAL EVIDENCE

Evidence of any of the following found on or in **TARGET PREMISES #3**:

7. **Attribution**, including evidence of who used, owned, or controlled **TARGET PREMISES #3** at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence; software that would allow others to control **TARGET PREMISES #3**, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software; and evidence of the lack of such malicious software that might allow others to control **TARGET PREMISES #3**.

8. **Access**, indicating how and when **TARGET PREMISES #3** was accessed or used, or how and when storage devices or other devices were attached to **TARGET PREMISES #3** to upload or download material, to determine the chronological context of computer access, use, and events relating to crime under investigation and to **TARGET PREMISES #3**'s user and the user's state of mind.

9. **Security**, including passwords, encryption keys, and other access devices that may be necessary to access **TARGET PREMISES #3**.

10. **Internet Protocol addresses** used by **TARGET PREMISES #3** and information reflecting and relating to the same.

11. **Internet activity records**, including **TARGET PREMISES #3**'s firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

12. **Other contextual information** necessary to understand the foregoing evidence.

## III.    WHATEVER FORM

As used above, the terms "records" and "information" include all the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

## IV.    COMPELLED BIOMETRICS

Law enforcement personnel are authorized to (1) press or swipe JENKINS' fingers (including thumbs) to the fingerprint scanner of **TARGET PREMISES #3**; and/or (2) hold **TARGET PREMISES #3** in front of her face and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

## V. SEARCH PROCEDURES FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION

1. The seized material is not expected to contain potentially privileged information (material that may potentially be protected by the attorney-client privilege, the attorney work product doctrine, or other recognized privilege or protection).

2. However, if potentially privileged material is encountered, the following procedures will be followed.

3. These procedures will be executed by: (a) law enforcement personnel conducting the investigation and search and other individuals assisting law enforcement personnel in the search, including any prosecutor participating in the investigation (the "Search Team") and (b) the Special Matters Unit ("SMU") of the Criminal Division, Fraud Section. SMU attorneys and support staff are not and will not become part of the prosecution team and have a separate reporting chain from the prosecution team.

4. If, during its review of the material identified above, the Search Team determines that a document appears to contain potentially privileged material, the Search Team will discontinue its review and will notify the SMU.

5. The data that may contain potentially privileged material will be transferred to the SMU.

6. An SMU attorney may review the data containing potentially privileged material. If the SMU attorney determines that the data does not contain potentially privileged material, the document may be returned to the Search Team. If the SMU attorney determines that material is potentially privileged, the SMU attorney may do any of the following: (a) apply ex parte to the court for a determination whether or not the material contains privileged information; (b) defer seeking court intervention and instead segregate the material in a manner that makes it inaccessible to the search team; or (c) disclose the material to the potential privilege holder, request a privilege log if the potential privilege holder asserts privilege, and seek a ruling from the court regarding the material if the parties cannot reach agreement.

**ATTACHMENT B-4**

I.  **ITEMS TO BE SEIZED FROM TARGET PREMISES #4**

The items to be seized from **TARGET PREMISES #4**, as described in Attachment A-4, are the following, which constitute evidence, fruits, instrumentalities, and contraband of violations of the Controlled Substances Act, including: 21 U.S.C. § 841 (Distribution of Controlled Substances); 21 U.S.C. § 846 (Conspiracy to Distribute Controlled Substances), 21 U.S.C. § 856(a)(2) (Maintaining a Drug-Involved Premises); and 18 U.S.C. §§ 1956 and 1957 (Money Laundering and Money Laundering Conspiracy) (collectively, the "Target Offenses"), and involving SHALANNA JENKINS, MONIQUE WASHINGTON, RONALD PATRICK, SERVMED, and others known and unknown involved in the commission of the Target Offenses, occurring on or after January 11, 2022:

1. **Records related to, or purporting to reflect, the practice of medicine or pharmacy**, including prescriptions; patient files; scheduling records; patient sign-in sheets, patient visit logs, signature logs, and counseling logs; correspondence with patients, telephone messages, telephone message pads, and records of communication with or about patients or providers; daily dispensing logs and daily inventory logs; patient forms and consent forms; insurance records, including records of communications with insurance companies, insurance pre-authorization records, insurance enrollment records, insurance claims, and insurance payments; and any other records related to the dispensing, distributing, or return of controlled substances.

2. **Controlled substances**, including oxycodone, hydrocodone, carisoprodol, alprazolam, and promethazine with codeine.

3. **Non-controlled substances**, including promethazine without codeine.

4. **Compliance records**, including pharmacy and clinic licenses and certifications, policies and procedures, audit records, and communications with, about, or relating to the work of oversight agencies, and any records required to be kept under federal or state law, including DEA Forms 222.

5. **Records of operations**, including those relating to or reflecting purchasing, prescribing, reporting, distributing, and dispensing controlled and non-controlled substances, including invoices, order forms, credit memos, and correspondence with drug wholesale distributors, manufacturers, clinics, and pharmacies.

6. **Corporate and business records**, including articles of incorporation, resolutions, records regarding officers' duties and responsibilities, licensing records, property records, corporate structure records, records of control and ownership interests, business agreements and contracts, lease agreements, equipment rental agreements,

and agreements with vendors, business partners, and affiliates, including wholesalers, labs, diagnostic testing facilities, clinics, medical providers, and staffing companies.

7. **Financial records**, including those constituting, reflecting, or relating to bills, tax records, invoices, purchase orders, booking ledgers, real estate, investments, retirement accounts, bank and brokerage accounts, checks, wire transfers, check registers, canceled checks, deposit tickets, and records of transfer, safe deposit boxes, and records of other assets or items evidencing money, assets, wealth, or other items of value involved in or traceable to drug diversion and trafficking. Such records further include those relating to any financial instrument and any exchange of anything of value; and records reflecting or revealing the locations of funds and any items of value, and records thereof.

8. **Currency and items of value**, including cash and cryptocurrency and related devices and containers, denomination bands, precious metals, and jewelry.

9. **Tax-related records**.

10. **Personnel and payroll records**, including employee lists; documents reflecting names, addresses, and duration of employment; personnel files; disciplinary records; pay schedules and payroll documents; work schedules, time sheets, appointment books; notes of communications with patients, providers, callers, or visitors; records showing the services provided by and all payments made to, from, or for pharmacists, pharmacy technicians, pharmacy technician-trainees, and other persons providing pharmacy or health-related services; and records reflecting the use consultants and staffing agencies, physician and practitioner finders, temp agencies, and any individual or company assisting in the location of pharmacy providers or staff.

11. **Records of communications**, including records reflecting or constituting, in draft, final, and any other form, personal diaries and letters; correspondence to, from, and between owners, providers, employees, patients, and individuals transporting patients or prescriptions; and transmissions by text message, iMessage, messaging application, facsimile, and e-mail (including attachments), reflecting or relating to exchanges between or involving any of the business owners, employees, agents, representatives, wholesalers, and customers.

12. **Images and videos**.

13. **Calendars**, appointment books, telephone message pads, day planners, logs, correspondence, rolodexes, emails, and address books.

14. **Electronic equipment**, including computers, smart phones (including cellular telephones and SIM cards or other portable memory chips used to transfer information between cell phones), USB and other external or internal hard drives, flash drives; and anything reflecting or constituting passwords, encryption keys, and other access devices that may be necessary to access electronic equipment and any data contained on electronic equipment.

## II.  WHATEVER FORM

Any information described in the preceding paragraphs includes evidence in whatever form and by whatever means created or stored, including, but not limited to, deleted items, drafts, and items maintained in trash or other folders; electronic and magnetic media; electronic data processing and storage devices; computers and computer systems; mobile devices, tablets, and smart phones; thumb drives, network attached storage, optical storage devices such as CD/DVD/Blu-Ray, and any computer relationship operational equipment; any and all records showing or bearing indicia of the use, ownership, possession or control of any of the same; and video/audio recordings, including those recorded on the pharmacy's video/audio surveillance system, together with system documentation, operating logs, and software and instruction manuals.

## III.  ADDITIONAL DETAIL RELATING TO COMPUTERS

For any smart phone, computer, or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (any such thing a "COMPUTER"):

1. **Attribution evidence**, including evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence; software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software; and evidence of the lack of such malicious software that might allow others to control the COMPUTER.

2. **Access evidence**, indicating how and when the COMPUTER was accessed or used, or how and when storage devices or other devices were attached the COMPUTER to upload or download material, to determine the chronological context of computer access, use, and events relating to crime under investigation and to the COMPUTER user and the user's state of mind.

3. **Security evidence**, including passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER.

4. **Internet Protocol addresses** used by the COMPUTER and information reflecting and relating to the same.

5. **Internet activity records**, including the COMPUTER's firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

6. **Other contextual information** necessary to understand the foregoing evidence.

## IV.   COMPELLED BIOMETRICS

During the execution of the search of **TARGET PREMISES #4** described in Attachment A-3, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual, who is found in **TARGET PREMISES #4** and reasonably believed by law enforcement to be a user of a device that is found in **TARGET PREMISES #4** and falls within the scope of the warrant, to the fingerprint scanner of the device; (2) hold a device found in **TARGET PREMISES #4** in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

## V.   SEARCH PROCEDURES FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION

1. The seized material is not expected to contain potentially privileged information (material that may potentially be protected by the attorney-client privilege, the attorney work product doctrine, or other recognized privilege or protection).

2. However, if potentially privileged material is encountered, the following procedures will be followed.

3. These procedures will be executed by: (a) law enforcement personnel conducting the investigation and search and other individuals assisting law enforcement personnel in the search, including any prosecutor participating in the investigation (the "Search Team") and (b) the Special Matters Unit ("SMU") of the Criminal Division, Fraud Section. SMU attorneys and support staff are not and will not become part of the prosecution team and have a separate reporting chain from the prosecution team.

4. If, during its review of the material identified above, the Search Team determines that a document appears to contain potentially privileged material, the Search Team will discontinue its review and will notify the SMU.

5. The data that may contain potentially privileged material will be transferred to the SMU.

6. An SMU attorney may review the data containing potentially privileged material. If the SMU attorney determines that the data does not contain potentially privileged material, the document may be returned to the Search Team. If the SMU attorney determines that material is potentially privileged, the SMU attorney may do any of the following: (a) apply ex parte to the court for a determination whether or not the material contains privileged information; (b) defer seeking court intervention and

instead segregate the material in a manner that makes it inaccessible to the search team; or (c) disclose the material to the potential privilege holder, request a privilege log if the potential privilege holder asserts privilege, and seek a ruling from the court regarding the material if the parties cannot reach agreement.